JOSEPH ZOGLIO, Admr., *vs.* T. W. WATERMAN COMPANY.

JULY 5, 1916.

PRESENT: Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

*(1)   New Trial.   Newly Discovered Evidence.*

If the newly discovered evidence would be likely to change the verdict a new trial will be granted, even though the evidence might be merely cumulative.

*(2)   New Trial.   Newly Discovered Evidence.   Cumulative Evidence.*

In an action to recover for the death of intestate caused by a runaway horse, the runaway character of the horse and its viciousness was a material issue, but there was no evidence at the trial on the runaway character of the horse, but after verdict for defendant plaintiff petitioned for new trial for newly discovered evidence, showing that the horse had previously run away and

had the reputation of a runaway. At the trial plaintiff brought out in cross examination of one of defendant's witnesses that the horse shied and got frightened at times.

*Held,* that the evidence was not cumulative, but even if it was cumulative of that of the witness brought out in cross examination it would not be a reason to refuse a new trial, for the fact that newly discovered evidence is cumulative of evidence incidentally favorable to the unsuccessful party drawn out in cross examination of an adversary witness is no reason for refusing a new trial.

*(3)    New Trial.    Newly Discovered Evidence.    Due Diligence.*

If a party fails to question or examine a person known to have information on a subject as to which evidence is desired, or in such a position that he would naturally have such information it is no excuse for such failure that the person is unwilling to talk or is believed to be hostile.

*(4)    New Trial.    Newly Discovered Evidence.    Due Diligence.*

Filing a bill of discovery or taking the depositions of the officers and employees of the opposing party cannot be regarded as conditions precedent to the showing of due diligence in procuring evidence so as to preclude the court from finding due diligence has been shown by the efforts set forth in affidavits submitted on a motion for a new trial on the ground of newly discovered evidence.

*(5)    New Trial.    Reasons of Court.*

If a court followed the correct rule in making its decision on a motion for new trial, it is immaterial what rule it considered in its discussion, and did not follow.

TRESPASS ON THE CASE for negligence. Heard on exceptions of defendant and overruled.

JOHNSON, C. J. This is an action of the case brought by Joseph Zoglio, as administrator of the estate of Pasquale Zoglio, against the T. W. Waterman Company for damages because of the death of Pasquale Zoglio. The death was caused by a runaway horse of the defendant on the 16th day of October, 1913, on Washington street, in the city of Providence. The case was tried before Mr. Justice Doran and a jury on the 1st and 2nd day of December, 1914. The jury rendered a verdict for the defendant and the plaintiff made a motion for a new trial which was granted by Mr. Justice Doran because of newly discovered evidence. The defendant duly excepted and thereafter prosecuted its bill of exceptions which is now before this court. The only

exception is to said decision of the justice granting a new trial on said ground.

From the evidence it appears that on the 16th day of October, 1913, between 12:45 and 1 o'clock P. M., the plaintiff's intestate was crossing Washington street at the City Hall, going in the direction of City Hall. When he had got almost across the street a horse of the defendant, which was attached to an express wagon and was running away, ran into him, knocked him down and the wheels went over him causing the injuries from which he died. The horse had been left standing in front of the defendant's place of business on Dorrance street with the bit out of its mouth and with a feed pail attached to its head. A weight was attached to the ring of the bit. The defendant claimed that the wheels were tied, but this was disputed by the plaintiff. The plaintiff himself offered no evidence as to the character of the horse, but when the defence was being put in he brought out from the driver in cross-examination that the horse was kind of frightened at things at times and would shy, but the driver said that was all. It was not claimed that there was any contributory negligence on the part of the deceased.

From the rescript of the trial justice, it appears that he based his decision as to the sufficiency of the newly discovered evidence on 1st: the parts of the new evidence relating to the horse having previously run away and to the horse's disposition in other respects than its habit of shying; and 2nd: the part of Bliss's affidavit saying that the wheels were not tied when the horse started to run.

Upon the first point Ludwig Stromberg made affidavit as follows: "It was a very lively, nervous acting horse, always in a kind of half trot. It was afraid of everything, would shy at a piece of paper or an automobile or a train or an electric car and would stand right straight up on its hind legs and would try to run away. It ran away once while we had it getting away from the driver altogether. We had to send two men with the horse, we could not do anything

with him.   The driver could never leave his seat.   It was not safe to try to hitch him.   We never tried to tie the wheels or hitch the horse around here because we did not think it was safe the way he was acting.   I tried him a half a dozen times and when he saw an automobile he would try to turn around and stand up straight on his hind legs and run away and act funny generally.   It would be all I could do to hold him.   We couldn't do anything with him and got another horse from T. W. Waterman Company in place of him.   I do not think it is safe to leave this horse with the bit out of his mouth, with a feed pan on his head and weight attached to the ring of the bit nor would it be safe to tie the wheels unless there was such a heavy load on the wagon that he could not move it.   We had the horse about two months.   I never saw a horse like it in my life.   He was afraid of everything.   When he got out of the barn his eyes would stick out of his head like balls of fire.   It was a vicious horse.   He was afraid even of a puddle of water. It was perfectly obvious what kind of a horse it was.   We tried to break him of his fear, but we could not do anything with him.   He would get perfectly panic stricken and uncontrollable.   Any one could see what kind of a horse it was. They couldn't help seeing it."

William Bullock made affidavit that the horse was under his care while at the Gorham Manufacturing Co., that he had been head stableman there for four or five years, was fifty-one years old and had driven and had charge of horses all his life; that "it was too lively, too much horse for us.   He ran away with me at one time;" that he would not dare to feed him with the bit out of his mouth even if the wheels were tied; that it was not safe to leave him for a minute without having a man with him.   He said:   "When he ran away with me I had hold of the rein by his head and he dragged me around on the dump and over the bank."

William R. Colwell made affidavit as follows:   "When this strawberry roan horse ran away at Gorham's I was present.   Mr. Bullock had hold of the reins at his head.

The railroad was about 100 feet from him.   The horse dragged
Bullock about 50 feet and then got away from him.   It
smashed the wagon against a pole and kept on going."

Upon the second point Robert Hicks made affidavit as
follows:   "I saw the horse standing there after Thompson
had gone upstairs to dinner.   It had a feed pail on its head.
The weight was simply snapped into the ring of the bit and
the strap or rope ran right down to the weight without going
around or into anything.   The bit was out of the horse's
mouth.   The wheels were not tied."   Bliss's affidavit was as
follows:   "This strawberry roan horse was standing on the
right hand side of the street facing the City Hall, attached to
an express wagon.   The feed pail was on its head; the bit was
out of its mouth, and the weight was attached to the ring of
the bit.   The strap attached to the weight ran straight from
the ring of the bit down to the weight.   The wheels of the
wagon were not tied or fastened in any way.   I went in
back of the wagon and just as I stepped upon the sidewalk an
automobile came along going toward the freight house
and this horse started.   When he first commenced to start,
he commenced to dance around, and I ran out to catch
him and hold him, and he shied right off and ran down
the street."

This court, in agreement with other courts of last resort,
has always held that newly discovered evidence, to be a
ground for new trial should be of importance, and that due
diligence should be shown.   But this court has not held that
one particular kind of newly discovered evidence, that is,
cumulative evidence, shall never be the ground for a new trial.

In *Burlingame* v. *Cowee*, 16 R. I. 40, the affidavits of
newly discovered evidence were offered.   Some of the
testimony contained in the affidavits was merely cumulative,
as the witnesses called by the defendant had testified to the
same effect.   The court said:   "This, of course, weakens it
as a ground for new trial."

In that case counter affidavits were filed in respect to
these affidavits and the court speaking of the counter

affidavits said: "Of course, the court will always use such affidavits (counter affidavits) circumspectly, when received, to enlighten, not control, its discretion."

In that case the court, in denying the new trial, said: "We are not satisfied that the verdict would be materially reduced in a second trial. On the contrary, all things considered, it is not clear to us, in the light of our experience, that it might not be increased rather than reduced."

(1)  And that expresses the true doctrine, that if the newly discovered evidence would be likely to change the verdict, a new trial will be granted, even though the evidence might be merely cumulative.

In *McDonald* v. *R. I. Co.*, 26 R. I. 467, the court said: "The newly discovered evidence relied on by defendant in support of its petition for a new trial is merely cumulative, and is not of such a character as to be so controlling upon the point to which it relates that it would probably affect the verdict. It does not, therefore, constitute a sufficient ground for a new trial." See, also, *Windham Bank* v. *Kendall*, 7 R. I. 77; *Heaton* v. *Fire Ins. Co.*, 7 ib. 502.

In *Walker* v. *Walker*, 86 Atl. 894, after trial and decision for the petitioner, a new trial was granted because of affidavits made after the trial, showing that the condition of things upon which the decision was based was impossible. There were counter-affidavits in that case to the effect that much doubt exists as to the conclusiveness of the facts alleged in the principal affidavits. The court said: "This, however, cannot be passed upon properly except at a trial when the opportunity may be given to examine and cross-examine the medical witnesses."

In the case of *Walker* v. *Walker, supra*, the court decided that the newly discovered evidence was of such importance as to require a new trial of the case.

In *Tavares* v. *Dewing*, 87 Atl. 315, the newly discovered evidence related to the plaintiff's claim that he was absolutely ignorant of machinery and totally unable to appreciate any danger to himself therefrom. It appears from the newly

discovered evidence that he had worked on a farm, in 1908, where a gasoline engine was in use to operate a thresher, and that he himself must have had some knowledge thereof and an appreciation of this danger, because he helped to run the threshing machine.  A new trial was granted in part upon this newly discovered evidence.  That evidence, while it indeed tended to impeach the plaintiff, nevertheless also had a direct affirmative bearing upon one of the material issues in the case.  In that case it might have been argued that the defendant might have discovered that evidence before, but the court did not so rule.  In other words, the mere fact that newly discovered evidence does impeach the evidence of the plaintiff or one of his witnesses, does not render it inadmissible.

In *Hughes* v. *R. I. Co.*, 67 Atl. p. 450, a new trial was granted for newly discovered evidence.  The court said: "We think the Superior  Court erred in considering the proposed evidence of the conductor as merely impeaching or discrediting the testimony of other witnesses.  It does, indeed, discredit them by inference; for, if it is true, their testimony is false.  But contradicting a witness is not what is meant by impeaching him.  Neither is the conductor's evidence simply cumulative.  While his memory may be refreshed by inspection of the time card which he filled out and signed, his own statements under oath and open to cross-examination will have far greater probative force, and the evidence which he offers has a much wider scope than his  memoranda. We think the defendant was justified in believing that this witness was beyond its reach, and that it was hopeless to attempt to produce him at a subsequent time.  This being so, it had no grounds for a motion for continuance, and such an application would, indeed, have savored of 'trifling with the court.'"

In *McDonald* v. *Lawton Spinning Co.*, 67 Atl. 451, the court said:  "We do not think the newly discovered evidence is of such a character or weight as to be likely to change the view of the case which was taken by the jury."  New trial denied.

In *Thornton* v. *R. I. Suburban Railway Co.*, 67 Atl. 451, a new trial was granted for newly discovered evidence as to the physical, condition of the plaintiff. The court said: "All these things combine to convince the court that from the manner in which the case was presented to the jury they were led to take an exaggerated view of the severity of her injuries to such an extent as to influence them improperly in the finding of the large damages awarded."

In *Heath* v. *Cook*, 68 Atl. 427, the court said: "The alleged newly discovered evidence is not in our opinion of such a character as to be likely to change the decision of a jury upon the merits of the case. It does not bear upon the main issue, but only affects the credibility of certain witnesses."

In *Heeran* v. *R. I. Co.*, 72 Atl. 389, where there was (1st) a verdict for the plaintiff; (2nd) a verdict for the defendant, the plaintiff petitioned for a new trial on account of newly discovered evidence, having discovered the motorman of the car which killed the deceased. The court said: "In the circumstances the testimony of the motorman is important and the same, if obtainable, should be offered for the consideration of a jury." On the motion for reargument: "We are still of the opinion that the testimony of the motorman should be submitted to a jury."

In the case at bar there was no evidence at the trial on the runaway character of the horse. But the newly discovered evidence is that the horse had previously run away and that it had the reputation of being a runaway. The fourth count of the declaration alleged that the horse had run away before and was vicious and that the defendant knew it; and to this fourth count the defendant pleaded the general issue. The runaway character of the horse and its viciousness was therefore in issue and it is manifest that it was a material issue. Some of the newly discovered evidence is relevant to this issue and to nothing else. Such evidence is not cumulative. In 29 Cyc. 908, *Alger* v. *Merritt*, 16 Iowa, 121, at p. 127, is cited to the effect: "If the new

evidence be specifically distinct and bear upon the issue, though it may be intimately connected with some part of the testimony at the trial, it is not cumulative."

*Waller* v. *Graves*, 20 Conn. 305, 310, is also cited as follows: "There are often various distinct and independent facts going to establish the same ground, on the same issue. Evidence is cumulative which merely multiplies witnesses to any one or more of these facts before investigated, or only (2) adds other circumstances of the same general character. But that evidence which brings to light some new and independent truth of a different character, although it tend to prove the same proposition or ground of claim before insisted on, is not cumulative within the true meaning of the rule on this subject."

The contention of the defendant seems to be that the evidence as to the runaway disposition of the horse is cumulative to the evidence brought out in the cross-examination of Thompson that the horse shied and got frightened at times. Its claim is that "this is evidence of the same general character and relates to the same point, the disposition of the horse." This claim, we think, includes too much under the expression "the same point." A horse may shy and yet not be a runaway horse; a horse may get frightened and yet stand without hitching; a horse may have a tendency to start when left alone and yet not be a runaway horse. It is too broad a claim to say that evidence on one of these characteristics is cumulative to evidence on another. Even if the newly discovered evidence was cumulative of that of the driver of the horse brought out in cross-examination it would not be a reason for refusing a new trial. In 29 Cyc. 909, it is said: "The fact that newly discovered evidence is cumulative of evidence incidentally favorable to the unsuccessful party drawn out in cross-examination of an adversary witness is no reason for refusing a new trial."

This matter was carefully examined by the court in the case of *White* v. *Nafus*, 84 Ia. 350. That was a will case and the plaintiff was the proponent. A witness, Alexander,

testified for the plaintiff. In cross-examination it appeared that the other witness to the will was not present when the will was signed but was at home sick. The defendant later discovered the evidence of a witness named Dawson who stated in his affidavit that he was present when the will was executed and that the witness other than Alexander was not present, but was at home sick. The court said, page 353: "Conceding the evidence of Dawson to be cumulative of that of Alexander, as drawn from him on a cross-examination; a controverted legal proposition is presented—whether or not the rule, that a new trial will not be granted for newly discovered evidence that is merely cumulative; will apply to the above state of facts, or has its application alone to evidence that is cumulative of that offered by the party seeking the new trial? The object of a cross-examination is not to establish facts in behalf of the party permitted to cross-examine, but it is to test the value of the statements made on the direct examination; and it is always within certain lines and limitations which the direct examination may fix and prescribe. It is true that such an examination may sometimes furnish proof of facts favorable to the other side, but it is only incidental; and the direct and cross-examinations constitute evidence for the party calling the witness. To our minds, it would be a harsh and unjust application of the rule to say that newly discoverd evidence shall not be ground for a new trial because cumulative of evidence incidentally favorable to the party on cross-examination. In many cases, such evidence, because of its meagreness, would not be relied upon. The natural meaning or understanding of cumulative evidence, as applied to new trials, is evidently that to be added to evidence before used by the party to establish the same particular fact; that is, the party shall not make one attempt to establish the fact by evidence, and failing, have a new trial to make another attempt by additional evidence."

Similarly, in *Haughton* v. *Bilson,* 84 Kan. 129, at p. 132, the court says: "Of course a losing party may not demand a

new trial because he has discovered a way in which to contradict his own witnesses. But if he has been defeated by reason of evidence offered by the adverse party which he has been unable to meet, and afterward discovers witnesses who are able to contradict those of his adversary, his new evidence may not be rejected as cumulative, notwithstanding evidence of the same sort, directed to the same question was given at the trial."

In so far as there was any testimony as to the character and disposition of the horse, it was to the effect that the horse was safe and of a good disposition. Thompson, the driver, testified in cross-examination, that the horse did "nothing very much, may be thrash around, come up quick, something like that, and he would kind of shy at it, that is all" (Tr. p. 136); that he would just "shy and go right along," and that not very lively; that he did not have to rein him in much and sometimes not at all; that "he wouldn't run at all;" that he did not start ahead when he jumped, but only sideways (Tr. pp. 136, 137). But Salisbury, a witness for the defendant, testified in cross-examination that the horse was not a green horse; that it was a second-handed horse; that he called a horse second-handed, when it was an old plug; that this horse was an old plug; that he never saw it shy or get frightened (Tr. pp. 149, 150).

The tendency of this evidence was to show that the horse was without spirit and with only a slight tendency to shy. The newly discovered evidence tends to show that the horse was high spirited, a crazy acting horse; that the Gorham Company had always to have two men with him; that he required hard driving to keep him down; that he was a runaway, and that he had the reputation of being a runaway. The newly discovered evidence cannot be regarded as merely cumulative to the evidence brought out in cross-examination of Thompson. The newly discovered evidence is not evidence of the same kind to the same point. It is evidence to a new point and so far as it is related to the evidence in the case it is not of the same kind, but contradictory.

Defendant's counsel contend that "the trial justice erred in not deciding that the affidavits do not show due diligence on the part of the plaintiff in procuring evidence for the trial. The diligence of the plaintiff and his attorneys will best appear by giving some quotations from the affidavits.

Joseph Zoglio, the plaintiff, made affidavit that "a few days after the trial of said cause, I was at one time in Lavell's bottling establishment, on Fountain street, in the city of Providence, where I am accustomed to buy beer for family use; that I conversed with the manager about the case and he said that it was too bad I had lost it; that while I was there he called in some one from outside the premises and he asked him a lot of questions concerning the horse. The man admitted that he knew the horse and he said that Mr. Thompson was the driver, but when he was asked who else had driven the horse, he stated that he was not going to tell, that he was not going to get mixed up in it. During the conversation he mentioned the fact that the horse came from Gorham's. Up to that time I had not had any suspicion that the horse had ever been at Gorham's. I forthwith informed one of my attorneys, Mr. Waterman, of what he had said. The man's name was Conley, but I do not know his first name."

Lewis A. Waterman, one of the attorneys of the plaintiff, made affidavit, "that prior to the completion of the trial in said cause I had interviewed and interviewed personally all the witnesses who testified for the plaintiff in said cause in regard to what they knew about the accident and this horse, and got from them all the information that they possessed; that during the progress of the trial I asked the driver of the horse, James H. Thompson, in the corridor of the court house, whether that horse had ever run away with him or tried to run away with him, or whether he knew about any runaway, and he stated that it had not run away, or tried to run away, and that he did not know about any runaway; that at no time did I suspect that the horse had ever belonged to or been used by the Gorham Manufacturing Company.

I supposed that it had come from some other place and been purchased by the T. W. Waterman Company and, so far as his use in this part of the country was concerned, that it had always been used by the T. W. Waterman Company and that any information as to a runaway would relate to a runaway while it was in the possession of the T. W. Waterman Company. The declaration so stated, namely, that said horse was in the habit of running away from the control of the said defendant, its agents and servants. I was informed by my associate, who had been in the case from the beginning, that he had endeavored to find out about the horse having run away before and he could get no testimony to that effect. A few days after the trial of the case, Mr. Zoglio came to me at my office and informed me that he heard that that horse at one time belonged to the Gorham Manufacturing Company. I thereupon went to the Gorham Manufacturing Company's stable and attempted to interview a man whom I found in the stable, but he would not talk without permission of his superiors. I thereupon arranged with the superintendent to interview some one who knew about that horse and the superintendent sent for Mr. Stromberg, and I was permitted to have an interview with him and obtain his affidavit. I then arranged to see Mr. Bullock who was connected with the stable and who had declined to talk with me before, and I did see him but be refused to sign any affidavit. In fact, he did not sign an affidavit until after he had signed an affidavit for the other side, but he did give me the name of Mr. Mulvey and Mr. Coldwell. I thereupon saw Mr. Coldwell and Mr. Mulvey. One of the persons that I interviewed, I do not know who, thought that the horse was purchased originally from a Mr. Weeks or Wicks who he thought kept a stable on Fountain street. I thereupon looked up persons of that name and eventually found Mr. Henry C. Wickes of West Clifford street. At first he was disinclined to talk, but he did state that when he was informed of the verdict he said that it was an unjust verdict. By appealing to his sense of the injustice under the con-

ditions, I finally induced. him to tell me about the horse, and I ascertained from him from whom he purchased the horse originally. He also informed me that a man who had formerly worked for the T. W. Waterman Company, but who had been injured or strained, had met him down near the station and had told him about the accident. He said he was there and saw the whole thing; that the colored man who was driving him had taken the bridle off and just hitched the weight on to it and left it standing there feeding with a feed pail on his head. He did not know who that man was, but he agreed to let me know if he ran across him again. I saw him several times about that but he had not ascertained who the man was. I also went around to the Waterman stables and inquired of Waterman's drivers on the street as to whether they knew about any such man and they all professed ignorance, but said I could find out at the office. I also inquired about what they knew about this horse and they professed absolute ignorance, but said I could find out at the office. Finally Mr. Wickes suggested that a certain man would know, who was still in the employ of the T. W. Waterman Company, the man he referred to from the description he gave. Consequently, I sent some one to see that man whom I thought he would not know and we got the name of Mr. Hicks who has given an affidavit in this case. We were not able to get his affidavit by the most diligent search until the Saturday before the hearing on motion for new trial."

Bennie Cianciarulo, one of the attorneys for the plaintiff, made affidavit "that prior to the drawing of the declaration in the above entitled cause I was informed by an elevator boy in the Grosvenor building, whose name I do not know, that this horse had run away before; that I asked him if he knew that personally and he said he did not. I asked him if he knew who did know about it and he said the driver previous to the driver who was then driving the horse knew about it. I told him to get the name of that driver and of any other person who did know about it and the address. He said

that he would.   I spoke to him several times after that and he reported that he had not been able to get the name of the driver or anyone else who knew about the runaway.   He told me the last information that he had gotten the man was in Fall River.   He did not know him by name but by sight. I inquired of a driver of one of Mr. Waterman's express wagons before drawing the declaration about the name of the driver who had driven this horse before the one who drove him at the time of the runaway and he told me he did not know the name.   I asked him if he knew whether or not that horse had run away before the time it killed Mr. Zoglio. He said that he didn't know anything about it.   I do not know the name of this man nor the time any more definitely than I specified when I talked with him.   I spoke to him in front of Waterman's place on Dorrance street.   I interviewed several other persons in regard to the matter.   The number I do not remember nor do I remember the times nor places. These people were people whose names Mr. Capotosto gave me.''

Antonio A. Capotosto, one of the attorneys for the plaintiff, made affidavit: "I myself investigated the case using every effort that I could to trace any witness or witnesses who could give me any information as to the prior history of this horse and on divers days went around to Waterman's place, on Dorrance street, and asked of various persons who were in attendance around Waterman's teams as to what they knew about this accident and as to the characteristics and history of the horse; that these persons on each of these occasions either referred me to the office of the T. W. Waterman Company where I would be given full information as they said, or else refused absolutely to talk, or said they knew nothing about the matter whatsoever. On one of these occasions I did go into the premises of the T. W. Waterman Company and was met with the answer by a man who seemed to be in charge that there was nobody there that could give me the information that I desired. I further depose and say that while this case was in my hands

and in preparation for trial, I interviewed one James Conlon, a police officer detailed at the crossing at Washington street and Exchange Place, which station is at or near the place where the accident happened; that I asked him if he knew anything about this case or about this horse, but he also could give me no information. He further promised to see what he could find out for me and although I saw him on a number of other occasions subsequent to the time when I had spoken to him about the case, he always told me that he had been unable to get me any information or find out any person who knew anything about what I desired to know. The names, times and places I cannot give except so far as above stated. I never suspected at any time that the horse belonged to and had been used by any one else in the city of Providence other than the T. W. Waterman Company."

Joseph Zoglio made affidavit "that I have read copies of the affidavits and counter-affidavits filed in said cause," . . . "that prior to the rendition of the verdict in said cause I did not know and could not have known by the exercise of reasonable diligence of the evidence and facts contained in said affidavits and counter-affidavits, and as to what said affiants would testify."

Antonio Capotosto and Bennie Cianciarulo, attorneys for the plaintiff, each made affidavit as follows: "I have examined the affidavits of newly discovered evidence filed in said cause, namely, the affidavits of John Mulvey, L. Stromberg, John Wilson, William R. Coldwell, Mabel Thompson, Henry C. Wickes, J. R. Jenkins, W. E. Brown and Robert Hicks; that I prepared said cause for trial using all the care and diligence that I was capable of; that until after the rendition of the verdict in said cause, and in fact until I was shown the above-mentioned affidavits, I did not know about the facts contained in said affidavits, nor as to what said affiants would testify, nor could I have ascertained the same by the exercise of reasonable care and diligence."

Lewis A. Waterman made affidavit: "That I assisted in the preparation of said cause for trial prior to the trial thereof, using all the care and diligence that I was capable of; that until after the rendition of the verdict in said cause, I did not know about the facts contained in the affidavits of John Mulvey, L. Stromberg, John Wilson, William R. Coldwell, Mable Thompson, Henry C. Wickes, J. R. Jenkins, W. E. Brown and Robert Hicks, nor as to what said affiants would testify, nor could I have ascertained the same by the exercise of reasonable care and diligence."

Lewis A. Waterman deposed that: "I obtained the name of Mr. Jesse Bliss through Mr. Robert Hicks, whose affidavit has been filed in said cause; that at the time I got the affidavit of Robert Hicks, I did not know that there was such a man as Jesse Bliss in existence; that at that time Mr. Hicks informed me that he knew of a man who saw the whole thing, but he did not know where he was at that time, but thought he could locate him; he said he would endeavor to locate him and get him to come in to see me. Later Mr. Hicks came in with Mr. Bliss and I obtained the affidavit of Mr. Bliss, which is the affidavit that has been filed in this cause; that prior to the time Mr. Hicks spoke to me about him I had no idea of the existence of any such man, and prior to the time I got his affidavit I had no idea that he knew about the facts stated in his affidavit." Bennie Cianciarulo and Antonio Capotosto and the plaintiff made affidavit to the same effect.

(3)    Defendant's counsel say in their brief: "It is well settled that if a party fails to question or examine a person known to have information on a subject as to which evidence is desired or in such a position that he would naturally have such information, it is no excuse for such failure that the person is unwilling to talk or is believed to be hostile, or even that he is the opposing party." With the exception of the concluding words, viz.: "or even that he is the opposing party," this statement is supported by the cases cited by counsel, and is we think sound. The exception indicated,

however, is not supported by any citation.    True, *Alsop* v.
*Commercial Ins. Co.*, 1 Sumner, 451, is cited among other
cases by defendant's counsel, and quoted from where Judge
Story, at p. 475, speaking with regard to the new evidence,
said:    "Now, the objections taken to it, as a ground for a
new trial, are, in the first place, that the defendants at the
trial made the point, that there was in all probability
another policy on profits, and yet that they used no diligence,
though they were thus put upon inquiry, to ascertain the
fact.    And what is still more strong, that having a clear
right in this court upon motion to have compelled the
plaintiff in this very cause to disclose the fact, whether there
was any prior policy or not, they chose to go to trial without
making the inquiry, though it is plain, that ordinary diligence
would have brought it out.    There is great force in this
reasoning; and no answer was given to it at the argument,
which entirely satisfied my mind.    To set aside a verdict
under such circumstances, on account of such newly dis-
covered evidence, would be to encourage laches, and want of
diligence, in regard to matters manifestly open to inquiry,
under the common priority clause in our policies.    It would
enable the party to take a double chance for a verdict."

The language quoted shows a state of facts which suffi-
ciently distinguishes that case from the case at bar.    We
could say nothing which would tend to make clearer its lack
of point as to the contention of defendant's counsel under
consideration.

Defendant's counsel also cite and quote from *Richter* v.
*Meyers*, 5 Ind. App. 33, where the court says, at p. 35:
"One of the witnesses was present at one of the conversa-
tions, and her presence was known by appellant, but he did
not call her at the other trial, because he had forgotten her
presence, and did not seek to ascertain whether she knew
anything about the case, because his relations with her were
unfriendly.    This was no excuse for his failure to make an
inquiry, but, on the contrary, disclosed an inexcusable lack
of diligence."

*Chicago, &c., R. Co.* v. *McKeehan,* 5 Ind. App. 124, where, at p. 128, the court says: "Weese lived in a situation which would enable him, if any one, to know of the horses being in the highway, and yet he was not applied to for information until after the trial. Here was another lack of diligence, a failure to investigate in the place where, from the nature of the surroundings, information would be most likely to be discovered. This delinquency cannot be excused upon the ground that Weese and wife had agreed to conceal their knowledge from appellant. It will not do to speculate upon what these parties might have done in the event they had been consulted, but it was appellant's plain duty to have interviewed them." . . . .

"The agreement of Weese and wife to conceal their knowledge from appellant can only be construed to mean that they would not voluntarily disclose it. We can not presume, in order to relieve appellant from the imputation of negligence, that they would have wilfully falsified respecting the occurrence."

*Smith* v. *Wagaman,* 58 Ia. 11, where the court says, at page 14: "The plaintiff himself had testified to what was said at these conversations, and the defendant contends that the newly discovered evidence is merely cumulative. We have not deemed it necessary to consider this question, because it appears clearly to us that the plaintiff's affidavit does not show that he had exercised due diligence. It shows that the plaintiff made inquiry to ascertain the names of the persons whom he remembered were present, but it does not show of whom he made inquiry. One Stewart testified that he was present and heard one of the conversations, but plaintiff's affidavit does not show that he made any inquiry of Stewart. The defendant was present at both conversations, if they took place, and the plaintiff's affidavit does not show that he made any inquiry of him."

*Doiron* v. *Baker, &c., Co.,* 131 La. 618, where the court, in deciding that due diligence was not shown, says, at p. 622: "and, furthermore, the witness might have been placed

under oath during the trial, even though he was considered an unfavorable witness."

*Gautier* v. *Douglass Mfg. Co.*, 52 How. Pr. 325, where the court says, at page 330: "'Again, a party is chargeable with laches, who, previously to the trial, knew that the witness whose testimony he seeks to introduce as newly discovered evidence, must probably, from his situation and employment at the time of the transaction, the subject of the controversy, have been conversant with the facts in relation to such transaction and who yet does not examine the witness in regard to those facts."

Defendant's counsel have cited many other cases which are doubtless sound, but which are in the main merely cumulative to the foregoing and which it will serve no useful purpose to discuss.

(4) The defendant's counsel further argue that the plaintiff might have taken the deposition of Thomas W. Waterman, an officer of the defendant corporation, and the depositions of all of his employees, or have filed a bill of discovery in the attempt to procure evidence in the case before the trial. No case has been cited supporting the view that such proceedings are required in order to show due diligence. We cannot think that such proceedings can be regarded as conditions precedent to the showing of due diligence in procuring evidence, so as to preclude the court from finding that due diligence has been shown by the efforts set forth in the affidavits submitted on a motion for a new trial on the ground of evidence newly discovered.

Defendant's counsel lay stress upon a portion of the rescript of the trial judge, where, after stating as he says "substantially," the rule as to the importance of new evidence, as given in a case cited therein from another jurisdiction, he says: "The new evidence offered in the case on trial is not sufficient to comply with such a rule," immediately adding "but such a rule has not yet been declared in this State." He said, however, "It seems to me that the items of new evidence are of sufficient importance to warrant

(5) a new trial." If he followed the correct rule in making his decision, it does not matter what rule he considered in his discussion and did not follow.

We are of the opinion that the trial justice did not err in finding that the newly discovered evidence is of sufficient importance to warrant a new trial; and that the plaintiff was not lacking in diligence in the discovery thereof.

We find no error in his decision granting the plaintiff's motion for a new trial.

The defendant's exception is overruled and the case is remitted to the Superior Court for a new trial in accordance with the decision of the trial justice.

*Bennie Cianciarulo, A. A. Capotosto, Waterman & Greenlaw, Charles E. Tilley,* of counsel, for plaintiff.

*Gardner, Pirce & Thornley,* for defendant.